# STATE OF MICHIGAN

# COURT OF APPEALS

---

DARLENE SMITH,

      Plaintiff-Appellant,

v

HERTZ SCHRAM, PC, and LISA STERN,

      Defendants-Appellees.

UNPUBLISHED
July 26, 2018

No. 337826
Oakland Circuit Court
LC No. 2016-152060-NM

---

Before: MURPHY, P.J., and JANSEN and RONAYNE KRAUSE, JJ.

PER CURIAM.

Plaintiff, Darlene Smith, appeals as of right the trial court's order granting summary disposition in favor of defendants Hertz Schram, PC, and Lisa Stern under MCR 2.116(C)(10) in this legal malpractice action arising out of a postjudgment divorce proceeding. We affirm.

As part of a consent divorce judgment entailing plaintiff and her ex-husband, David M. Leider, plaintiff was awarded a 50% interest in certain membership units, stocks, and vested stock options held by Leider in two associated companies, a limited liability company and a corporation, hereafter referred to as "the business" or "the company."[1] Leider was the company CEO. Leider was to hold plaintiff's interest in a constructive trust, as the divided business holdings were not currently transferrable. Going forward, Leider retained sole and full discretion to sell or exercise the units, stocks, and options, if permitted under company rules and agreements. Upon a future sale of any of the business interests, plaintiff was to receive her share of the proceeds as divided by the divorce judgment. The judgment directed Leider to provide plaintiff all documentation that Leider received regarding the business holdings during the period

---

[1] Plaintiff was also awarded an interest in unvested stock options, scheduled to accumulate about 15% of those options as they vested. The business holdings at issue were divided under a property settlement agreement (PSA) executed shortly before the divorce judgment was entered. The PSA was merged into the divorce judgment. An earlier settlement agreement after mediation that also covered the business interests was similarly merged into the divorce judgment; however, the PSA provided that it "superseded any and all prior agreements." Thus, the PSA controlled the division of the business holdings. References in this opinion to the divorce judgment will pertain to language in the PSA unless otherwise indicated.

-1-

in which Leider held plaintiff's interest in trust. Leider later relied on this language in arguing that the only discoverable documents were those that the company first sent to him.

In a postjudgment proceeding, attorney-defendant Stern, who was not counsel during the divorce action, was retained by plaintiff and pursued a motion to enforce the judgment of divorce, essentially seeking, with little success, information from Leider concerning the current status and value of the various business holdings in order to ensure compliance with the judgment. The matter went to mediation, where the crux of the dispute centered on the amount of documentation and information to which plaintiff was entitled, with Leider insisting that it was extremely limited based on the divorce judgment and plaintiff arguing in favor of broad discovery under fiduciary and trust principles. The mediator, who also served as the "discovery master," thought that plaintiff's discovery requests were reasonable for purposes of dispute resolution; however, she ultimately agreed with Leider that the divorce judgment severely limited plaintiff's right to discovery. Leider and the company itself, through company counsel, refused to comply with plaintiff's discovery requests. Plaintiff did not go to the family court, which had sent the case to mediation, to challenge the discovery roadblock and demand compliance with discovery requests. Having obtained some limited information from the mediator, who procured it from company counsel *in camera* and voluntarily, plaintiff decided to settle the matter. Part of the shared information was that a recent stock transaction was for $1.70 per share.

Under the settlement agreement, plaintiff received a lump sum payment of $65,000 from Leider, releasing her rights to any future claims under the divorce judgment. Within a few short months of that settlement, the company was purchased by way of a merger, resulting in Leider making approximately $2.2 million dollars on the pertinent business interests, where he exercised 700,000 stock options that had previously been encompassed by the divorce judgment, which had all vested, and where the stock sold at $4.23 per share. Had plaintiff not settled and sat tight, her portion from the sale would have been considerably higher than $65,000, assuming that Leider would still have exercised the stock options, which were set to expire in two more years. There was evidence suggesting that Leider, during the mediation process and before the settlement, was fully aware of the pending sale.

Plaintiff proceeded to sue Stern and Stern's law firm in the instant action, alleging legal malpractice arising from the circumstances surrounding the settlement. Plaintiff claimed that Stern had failed to obtain necessary and critical information with respect to the status and value of the pertinent business holdings. According to plaintiff, despite the lack of information, Stern nevertheless advised plaintiff that: Leider did not own certain common stock that ostensibly was covered by the divorce judgment; the stock and stock options were only worth $1.70 per share at most; the stock options were essentially worthless, considering that they were set to expire in two more years and Leider had the authority to allow the options to lapse without exercising them; plaintiff would have to pay Leider approximately $320,000 in order to exercise the options granted her under the divorce judgment if she did not settle; and that even if plaintiff had the ability to exercise the options, their net value was only about $75,000. Plaintiff also complained that Stern did not demand incorporation of a provision in the settlement agreement that made it subject to Leider not having made any misrepresentations. Defendants, on the other hand, contended that Stern squarely presented three options to plaintiff: (1) settle with Leider based on unverified information regarding the status and value of the business holdings; (2) spend more

money on litigation in the family court and attempt to obtain additional information through motions to compel discovery; or (3) drop settlement talks, dismiss the motion to enforce the divorce judgment, and simply wait to see what would transpire relative to the business interests, which was the recommendation of plaintiff's forensic CPA. And plaintiff chose to settle and move on with her life, absent any malpractice by Stern. The trial court granted defendants' motion for summary disposition, concluding that plaintiff failed to establish a genuine issue of material fact for purposes of the attorney-judgment rule. The court essentially agreed with defendants' position. Plaintiff appeals as of right.

We review de novo a trial court's ruling on a motion for summary disposition. *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011). With respect to the principles governing a motion for summary disposition brought pursuant to MCR 2.116(C)(10), this Court in *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013), explained:

> In general, MCR 2.116(C)(10) provides for summary disposition when there is no genuine issue regarding any material fact and the moving party is entitled to judgment or partial judgment as a matter of law. A motion brought under MCR 2.116(C)(10) tests the factual support for a party's claim. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). A court may only consider substantively admissible evidence actually proffered relative to a motion for summary disposition under MCR 2.116(C)(10). [Citations and quotation marks omitted.]

"Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party." *Skinner v Square D Co*, 445 Mich 153, 162; 516 NW2d 475 (1994); see also *Dextrom v Wexford Co*, 287 Mich App 406, 415; 789 NW2d 211 (2010) (a court must draw all reasonable inferences in favor of the nonmoving party).

The elements of a legal malpractice action in Michigan are: (1) the existence of an attorney-client relationship; (2) negligence in the legal representation of the client; (3) an injury that was proximately caused by the negligence; and (4) the fact and extent of the injury alleged. *Simko v Blake*, 448 Mich 648, 655; 532 NW2d 842 (1995); *Charles Reinhart Co v Winiemko*, 444 Mich 579, 585-586; 513 NW2d 773 (1994). A plaintiff has the burden of proving all of these elements in order to prevail. *Charles Reinhart*, 444 Mich at 586. "As in any tort action, to prove proximate cause a plaintiff in a legal malpractice action must establish that the defendant's action was a cause in fact of the claimed injury." *Id.* A plaintiff must show that *but for* the attorney's alleged malpractice, the plaintiff-client would have been successful in the underlying lawsuit. *Id.* Stated otherwise, the client seeking recovery from his or her former attorney is

faced with the difficult task of proving two cases within a single proceeding – the "suit within a suit" concept. *Id.* at 586-587. To hold otherwise would permit a jury to find a defendant attorney liable on the basis of speculation and conjecture. *Id.*

When an attorney is retained by a client in a cause, the attorney is obligated and has an implied duty to use and exercise reasonable skill, care, discretion, and judgment with respect to representing the client and management of the cause. *Simko*, 448 Mich at 655-656. All attorneys have a duty to act as would an attorney of ordinary skill, judgment, and learning under the same or similar circumstances. *Id.* at 656. "An attorney has the duty to fashion such a strategy so that it is consistent with prevailing Michigan law." *Id.* An attorney has no duty to guarantee or insure the most favorable outcome possible, and counsel is "never bound to exercise extraordinary diligence, or [to] act beyond the knowledge, skill, and ability ordinarily possessed by members of the legal profession." *Id.* "To require attorneys, or other professionals, to act over and beyond average skill, learning, and ability, would be an unreasonable burden on the profession and the legal system." *Id.* at 657. Lawyers cannot possibly be required to infallibly predict how a court will rule on a particular matter. *Id.* at 658 ("A lawyer would need a crystal ball, along with his library, to be able to guarantee that no judge, anytime, anywhere, would disagree with his judgment or evaluation of a situation.") (quotation marks omitted). The *Simko* Court also recognized the attorney-judgment rule, observing:

> Lastly, mere errors in judgment by a lawyer are generally not grounds for a malpractice action where the attorney acts in good faith and exercises reasonable care, skill, and diligence. Where an attorney acts in good faith and in honest belief that his acts and omissions are well founded in law and are in the best interest of his client, he is not answerable for mere errors in judgment. [*Id.* (citations omitted).]

This Court has held that a "plaintiff's settlement of [an] underlying action should not act as an absolute bar to a subsequent legal malpractice action." *Lowman v Karp*, 190 Mich App 448, 452-453; 476 NW2d 428 (1991). When a case is ended pursuant to a settlement rather than by a dismissal or adverse judgment, legal malpractice by an attorney in the action is more difficult to establish; however, a malpractice cause of action can succeed if it is shown that assent to the settlement by the attorney's client was compelled because misfeasance or nonfeasance by the attorney left no other recourse for the client. *Espinoza v Thomas*, 189 Mich App 110, 124; 472 NW2d 16 (1991). "When a settlement is compelled by the mistakes of the plaintiff's attorney, the attorney may be held liable for causing the client to settle for less than a properly represented client would have accepted." *Id.* at 123.

In our view, the very nature of this case presented a difficult and formidable challenge for plaintiff in establishing a viable claim for legal malpractice. Plaintiff has the burden of showing that but for Stern's alleged malpractice, plaintiff would have been successful in the underlying litigation. "Success" in the context of the postjudgment divorce proceeding and mediation would have entailed plaintiff receiving what she was entitled to under the PSA, as measured by the per-share price of $4.23 that was obtained in the purchase-merger, or a per-share price that more accurately reflected the true value of the stock, or a per-share price arrived at after negotiations where *both* parties had access to all of the relevant financial data regarding the business. But the two litigation options that plaintiff did not choose would not necessarily have resulted in such

success, nor placed her in a better position than the $65,000 settlement. Assuming negligence on Stern's part and even assuming that had plaintiff gone to the family court, the court would have compelled discovery, resulting in plaintiff learning of the stock's true value and the merger, there would always have been the prospect of Leider, perhaps out of spite and regardless of his own monetary loss, refusing to exercise the stock options, which options were ultimately the most relevant asset in this case.[2] Leider had an additional 900,000 stock options and restricted stock units that he acquired post-divorce that were not covered by the PSA; he could have exercised those options, for which he received over $2.2 million, but not the 700,000 vested stock options subject to the PSA. The same problem would have existed under a scenario in which plaintiff dismissed the motion to enforce the divorce judgment and sat tight, as recommended by her CPA expert. Leider might have simply chosen not to exercise the 700,000 options in that instance. Indeed, plaintiff was adamant that Leider would do whatever he could to circumvent her interest in the business holdings under the PSA. Absent evidence that Leider's decision to exercise the stock options would have been the same if plaintiff had taken a course of action different than settlement, which was not presented, establishing causation is purely speculative and defeats any recovery. However, we will proceed with further analysis.

We believe that the most concise and cohesive approach to analyzing this case is to examine Stern's actions on a step-by-step, chronological basis, followed by assessing Stern's advice relative to the three options available to plaintiff, determining whether at any point there was evidence sufficient to create a genuine issue of material fact on whether Stern committed malpractice. After Stern was retained, she pursued the motion to enforce the divorce judgment and she formally obtained the services of a forensic CPA. There is no claim of malpractice in regard to these two acts, both of which seem more than reasonable. Although Stern took a temporary detour by withdrawing the original motion to enforce the divorce judgment and filing a circuit court civil action, she renewed the motion to enforce the divorce judgment, and plaintiff makes no claim of malpractice in this respect. In connection with both motions to enforce the divorce judgment, Stern made attempts to obtain documents and information concerning the status and value of the stock and stock options through discovery practice, including documentation and information regarding prospective sales of the company. There is no claim of negligence arising out of these efforts, nor do we see any negligence; Stern was asking all of the right questions and seeking production of all of the right documents. Had the requested information and documents been produced, they would have been of benefit to plaintiff, allowing the CPA to soundly assess the status and value of the business.

The family court sent the case to mediation, and in the face of Leider's continuing objections to discovery requests and outright refusal to answer them, Stern presented her arguments to the mediator with respect to why plaintiff was entitled to the documents and information being sought. The mediator did not agree with Stern's trustee-fiduciary argument, and the mediator concluded that the issue concerning the 2010 sale of the 600 membership units in the limited liability company was a dead issue. Further, the mediator indicated that although

---

[2] The Preferred Series A and B stock only generated a total payout of approximately $90,000 upon sale under the merger.

she thought it was reasonable to seek and produce the requested documents and information regarding the company, as it would facilitate mediation and allow resolution of the dispute, she did not believe that the PSA actually obligated Leider to produce the requested documentation and information. Stern had no control over the mediator's conclusions.

The next step to analyze concerns Stern's response to the mediator's stance, to Leider's continuing refusal to produce documents and provide information, and to the interjection of the company's objections to discovery. The only possible avenue of redress was to take these matters to the family court and ask the court to compel discovery. Had Stern and plaintiff chosen this route, one can only speculate what the family court would have done when presented with the issues. We tend to believe that the company's objections based on the claim that the requested materials constituted protected proprietary and confidential information were alleviated by a stipulated protective order, such that the family court would not have barred discovery because of the company's objections. Leider's objections are a different story, considering the language in the PSA. The parties discuss the family court's comments and remarks made prior to mediation at the hearing on plaintiff's motion to enforce the divorce judgment, with plaintiff contending that they revealed a position favorable to allowing discovery and defendants maintaining just the opposite. However, the court, while suggesting that there should be some discovery, with only valid objections being made, also admonished plaintiff not to go on a fishing expedition. Ultimately, the family court expressed that it was simply too unfamiliar with the case to set any discovery parameters, leaving the matter to the mediator/discovery master. Stern informed plaintiff that one option involved going back to the family court, and plaintiff acknowledged being told of that option in her deposition. The tone of and language in Stern's emails to plaintiff, however, suggested that Stern did not feel confident that going to the family court would produce the desired results. In fact, Stern declared to plaintiff in a February 2014 email that "[t]his truly is the end of the road as far as discovery." In her deposition testimony, Stern clearly testified that she felt that returning to the family court would be a waste of time and money, as the court would likely rule in favor of Leider and side with the mediator, considering the language in the PSA. We note that attorneys are not required to infallibly predict how a court might rule on a particular matter. *Simko*, 448 Mich at 658. But we believe that this issue needs a bit more exploration.

Initially, we find somewhat troubling plaintiff's repeated complaints throughout her appellate brief about Stern failing to obtain information and documents regarding the status and value of the company and failing to verify the information communicated by the company's counsel to the mediator, without truly acknowledging that she made attempts to do so, that Leider and the company fought her at every turn, that the mediator thought that plaintiff had no discovery entitlement under the PSA, and that the PSA constituted a potential roadblock.[3] Indeed, plaintiff does not even attempt to make an argument with respect to why the PSA did not

---

[3] For example, plaintiff argues that "[t]hroughout the underlying enforcement proceeding, [Stern] neglected to obtain any information or documentation relative to Mr. Leider's holdings in" the company.

preclude discovery of vital information. The mediator opined that Stern was persistent in her attempts to gather information.

We do not agree with the company, Leider, the mediator, and Stern herself that the PSA severely limited the amount of available discovery. The language in the PSA simply stated that during the period of the parties' ownership of the business holdings, Leider was required to provide plaintiff with all documentation that he received regarding the holdings. The language did not state that plaintiff could never obtain any other documentation or information from Leider, nor did it state that documentation received by Leider was the only documentation that he could ever be required to share with plaintiff. In the context of subsequent litigation regarding the divorce judgment and the current status and value of business holdings *in which plaintiff had an ongoing interest*, the discovery requests served by Stern sought information "reasonably calculated to lead to the discovery of admissible evidence." MCR 2.302(B)(1).[4] We do not read the PSA provisions regarding documentation so broadly that they control or govern future discovery requests, restricting plaintiff's access to documentation and information concerning the status and value of company stock and stock options to only those documents received by Leider.

To the extent that Stern's advice to plaintiff can be accurately characterized as not recommending going to the family court and seeking a discovery order, or contemplating whether Stern should have recommended to plaintiff that she pursue an order by the court compelling discovery, as opposed to simply presenting it as an option, the issue of Stern's negligence turns on the construction of the PSA and the strength of that interpretation. If Leider's position on discovery, grounded in the PSA, was correct, or at least reasonably arguable, then the attorney-judgment rule would protect Stern as a matter of law and there was no malpractice in not recommending to plaintiff further action in the family court or in swaying plaintiff away from taking that course of action, assuming that is a fair characterization of the evidence. On the other hand, if Leider's position on discovery, grounded in the PSA, was *plainly* wrong, perhaps an issue of fact would exist on whether Stern committed malpractice in not recommending to plaintiff further action in the family court or in swaying plaintiff away from taking that course of action. Although, as explained above, we construe the relevant PSA language differently, we cannot conclude that Leider's and the mediator's construction was plainly wrong, such that Stern potentially committed malpractice. The interpretation of the PSA is subject to reasonable argument, and we are not prepared to fault Stern for her view and the failure to push plaintiff in the direction of further litigation in the family court. Of course, the causation problem would still support summary dismissal, even if we found the possibility of malpractice on Stern's part.

With respect to the option of dismissing the motion to enforce the divorce judgment and sitting tight, awaiting to see what would transpire, the CPA recommended that approach, plaintiff

---

[4] MCR 2.302(A)(4) provides that "[a]fter a postjudgment motion is filed pursuant to a domestic relations action as defined by subchapter 3.200 of these rules, parties may obtain discovery by any means provided in subchapter 2.300 of these rules."

acknowledged that the CPA made that recommendation, and Stern's emails, at times, could be construed as pointing plaintiff in the direction recommended by the CPA. The question becomes whether Stern was potentially negligent in not advising plaintiff that this was the better or more prudent course of action than settling. There was evidence that plaintiff informed Stern about her concerns that the company would go public or be sold in the future and that, as indicated in news articles, the company's growth was soaring. This information, however, was fairly indefinite and vague. Moreover, Stern initially indicated to plaintiff that taking the CPA's advice was the more sound approach. Stern emailed plaintiff in February 2014, telling her that the CPA "made it clear that it is likely far better for you to stand in the same shoes as [Leider] re: the options. However, the ultimate decision is yours." Subsequently, Stern somewhat backed away from that view on discovering that the stock options, which Leider completely controlled, would terminate in April 2016 if not exercised. And Stern had been repeatedly warned by plaintiff that Leider would stop at nothing to defeat plaintiff's award under the PSA. As a matter of law, we cannot find any malpractice by Stern in connection with her advice to plaintiff regarding the option of taking a wait-and-see approach. And again, we note the causation problem.

Next, it must be determined whether Stern was potentially negligent in advising plaintiff relative to settlement. More specifically, the question is whether Stern should have advised plaintiff against settling the case, instead of presenting settlement as one of three viable options, given the unverified information conveyed to the mediator and the absence of critical documents and information that had been requested. First, in light of multiple expressions by plaintiff that she just wanted to be done with the case, it is questionable whether plaintiff would have decided against settlement even if Stern was emphatic that settlement should not be contemplated. It cannot be over emphasized that plaintiff was fully aware of the fact that there was virtually no compliance with discovery requests and that the information that was obtained came through representations to the mediator by the company's attorney. For a period of time, plaintiff had been absolutely adamant that Leider produce documents and information regarding the status and value of the company's business holdings in which plaintiff had an interest under the PSA. But plaintiff came to realize that the documents and information would not voluntarily be forthcoming.

Representations made by the company's counsel to the mediator included a reference to a fairly recent stock transaction at the price of $1.70 per share, which was supposedly illustrative of the value of company stock and stock options, a claim that the stock options would terminate by April 2016 if not exercised, an assertion that plaintiff could not force Leider to exercise the options, a suggestion that plaintiff would have to pay about $320,000 to exercise options, as opposed to exercising them on a cashless basis, and a statement that there were no recent company appraisals. According to the mediator in her deposition testimony, company counsel did not inform the mediator that the company was up for sale, had been appraised by a banking and financial institution, and was being courted by the eventual purchaser.[5]

---

[5] This information was gleaned from the deposition testimony of the company's CFO and COO. We are deeply concerned that company counsel may have been aware of all that was occurring inside the company when speaking to the mediator.

This was information, or a lack thereof, being conveyed by an officer of the court – company counsel – to a court-appointed mediator, which in turn, as planned and understood by counsel, was shared with Stern.[6] And there was no dispute that the strike price of the options was $1.28 per share and that the 700,000 options covered by the PSA had all vested. Under these circumstances, we cannot conclude that Stern was negligent for presenting plaintiff with a settlement option that was based on calculations using information and figures that were either not in dispute or were supplied by a seemingly valid and knowledgeable source. The mediator and the CPA made virtually the same calculations. Holding Stern potentially liable for malpractice on the basis that she should have advised plaintiff against settlement would be tantamount to making her accountable for the apparent misrepresentations by company counsel and Leider's disclosure failures.

Plaintiff makes much of the claim that she could have exercised the options on a cashless basis, as testified to by the company's COO/CFO and suggested in the PSA itself, and that being advised to the contrary pushed her into a corner where she was effectively forced to settle. We disagree. First, plaintiff testified that she could have come up with the money, indicating that her parents could assist her, even though she had not talked to them about the matter. Second, company counsel, as well as Leider himself, asserted that plaintiff would have been required to make a cash payment, and we will not fault Stern for any deception. Third, the issue of whether the stock options awarded to plaintiff could have been exercised on a cash or cashless basis would be rendered entirely moot if Leider simply chose not to exercise the options. This component of the PSA on the stock options could be accurately characterized as rendering plaintiff's award illusory, and Stern was not involved in the underlying PSA. Plaintiff complains that she was incorrectly advised by Stern that the stock options were worthless, which also effectively made plaintiff believe that settlement was her only real option. Stern's assertions that the stock options were worthless were couched in terms of the PSA language that left Leider with unfettered discretion and control to exercise or decline to exercise the options and the fact that the options had an expiration date. Thus, in a sense, the stock options could very well have been worthless if Leider were to allow them to expire without exercising the options. Plaintiff fully understood and was apprised of these circumstances, and she, better than anyone, knew the lengths Leider might go to in order to deprive her of the divorce award. Had Leider not exercised the stock options, plaintiff's 50% share of the Series A and B stock would have been approximately $45,000 – $20,000 less than the settlement amount.

To the extent that plaintiff is accusing Stern of malpractice on the basis that the 600 membership units once held by Leider in the limited liability company and the 480,000 shares of common stock in the corporation were separate and distinct holdings, 50% of which were awarded to plaintiff, and that Stern failed to negotiate with that in mind, there is no support in the record for the factual predicate of the claim. Without contradiction, the evidence was that the

---

[6] We also note that in the mediation brief prepared by Leider's counsel, it was posited that the options would "lapse, terminate and become worthless" if not exercised by April 2016, and that plaintiff would "have to pay $319,192.56 to exercise them," but only if Leider, "in his sole and absolute discretion," decided to exercise the options.

600 units represented 480,000 shares of stock, such that they were one and the same. And the 600 units were sold for $60,000 in 2010, plaintiff received her $30,000 cut, and plaintiff executed a satisfaction and release. As stated by the mediator, any potential wrongdoing or invalidity relative to Leider's 2010 sale of the 600 units was a "dead issue." Moreover, Stern, who was not representing plaintiff in 2010, attempted to obtain documents and information regarding the 2010 transaction to see if it was a valid sale at an appropriate price, but she was rebuffed in her efforts. There was no malpractice by Stern on this matter.

At this stage, we quote testimony by plaintiff in her deposition that makes clear that she was fully aware of her three litigation options and the potential worthlessness of the stock options before choosing to settle:

> *Q.* And you had [litigation] options; right?
>
> *A.* Some.
>
> *Q.* Well, you had an option of not settling and going back to court to see if the Judge might disagree with what [the mediator] had done and order them to give you more information; right?
>
> *A.* Right.
>
> *Q.* And you had an option to settle and walk away and not go back to court in front of the Judge and take a sum of money and end the matter; right?
>
> *A.* Right.
>
> *Q.* You also had the option to dismiss your motion and just ride it out; right?
>
> *A.* I could have, yes.
>
> *Q.* You knew all along . . . that the [stock] options were slated to expire in April 2016; correct?
>
> *A.* Correct.
>
> *Q.* And so you knew that if . . . Leider didn't exercise his options before April of 2016, your share would become worthless; correct?
>
> *A.* Correct.
>
> *Q.* Was that a factor that went into your decision on what to do . . . ?
>
> *A.* I was basing it on what [Stern] had gotten; and [she] said they had gotten the information from [the company]. I was basing it on the information they had gotten.

-10-

*Q.* But there were other factors; right? If the options never expired, that might have played a different role in your decision; right?

*A.* Right. If I would have known that there was a deal on the table, too.

*Q.* Right. If you had known in February or March of 2014 that [the company] was in talks to merge . . ., you probably would have made a different decision regarding settlement; right?

*A.* Correct.

*Q.* And one of the discovery items that . . . Leider [was asked] to produce [by Stern] was information regarding any talks of sale or merger; correct?

*A.* Again, we had asked for it.

Finally, there is the issue whether Stern should have demanded the inclusion of language in the settlement agreement making it voidable if it was later discovered that Leider had materially misrepresented the value of the pertinent business holdings. It does not appear that the trial court directly addressed this issue. In her malpractice complaint, plaintiff alleged that Stern was negligent for "[r]ecommending and/or preparing a written settlement agreement that did not allow for or carve out any exceptions for undisclosed information should Plaintiff acquire information in the future that the represented values of [Leider's] assets and/or interest were materially different *from what he was representing*." (Emphasis added.) As defendants point out, there was no evidence that Leider himself made any affirmative misrepresentations regarding the value of and his interest in the business holdings. Plaintiff and Stern both acknowledged this fact in their deposition testimony. It was company counsel who may have affirmatively misrepresented the value of the stock and whether a company appraisal had been completed. And company counsel did not represent Leider; rather, he represented the company. Defendants argue that plaintiff "can't rely on a separate, unpleaded theory that the settlement should have included a provision based on [company counsel's] representations."

Defendants are correct that plaintiff did not frame the issue in the complaint as pertaining to company counsel's representations. Even in the affidavit of plaintiff's purported expert, he averred:

> Defendants failed to include in the settlement agreement that was executed following this mediation result any statements and/or representations indicating that the decision to settle was premised upon affirmative representations *made by the former husband* as to value, ownership, . . . . [Emphasis added.]

Accordingly, inclusion of the language in the settlement agreement urged by plaintiff would not have benefited her, so causation cannot be established.

Even if plaintiff's malpractice complaint alleged that Stern should have pressed for the inclusion of some escape mechanism in the settlement agreement tied to company counsel's

-11-

representations or even tied generally to information unknown or undisclosed to plaintiff at the time of execution, we can only speculate as to what would have transpired. Considering Leider's apparent knowledge of the pending deal, it is highly unlikely that he would have agreed to such language being added to the settlement agreement. Had he not agreed, we can only speculate with respect to plaintiff's response; perhaps she would still have settled, perhaps she would have pursued discovery in the family court, or perhaps she would have stayed put. In this scenario, regardless of whether plaintiff chose to pursue discovery or to wait it out, the causation problem discussed earlier would still exist.

Additionally, the fact that Stern did not request the inclusion of language in the settlement agreement protecting plaintiff from unknown information could be viewed as falling within the attorney-judgment rule. On one hand, it can be argued that she absolutely had to demand protective language due to the discovery blockade. However, on the other hand, demanding protective language could be viewed as being an exercise in futility and unnecessary, where the $1.70 per share price appeared to come from a sound source, especially considering that the source was making the representations to a court-appointed mediator. Again, faulting Stern for the apparent deception of others is not appropriate.

Affirmed. Having fully prevailed on appeal, defendants are awarded taxable costs under MCR 7.219.

/s/ William B. Murphy
/s/ Amy Ronayne Krause

-12-